Set for argument this morning is Liu v. Intercept Pharmaceuticals, No. 20-3488. Good morning. May it please the Court, my name is Megan Rimmel. I'm with the law firm of Frucchi & Frucchi on behalf of the Louise Bacon Law Firm. Excuse me, Ms. Rimmel, could you try to adjust the mics and the desks so that you're speaking into the microphone? It helps us to hear. Is that better? Yes, I think so. Okay. Thank you. Okay. Lead plaintiff's claims arise out of the federal securities laws under Section 10b and Rule 10b-5. Plaintiff's proposed amended complaint, and for clarity I'll be referring to the proposed amended complaint that was submitted with plaintiff's motion for reconsideration, alleges that defendants made three categories of false and misleading statements with Sienter in regard to Intercept's drug Ocalava. I'd like to focus on the last set, the third set of false and misleading statements that were made after. So I'd like to ask a preliminary question, please. There's a question about what we have jurisdiction actually to review that has been raised, and in light of the timing of the District Court's extension of time and so on and so forth. And I wondered if, in your view, that if we decide that we can only review the motion to reconsider, whether there's anything that falls outside that motion and the judge's ruling on it, or whether the motion to reconsider and the judge's ruling, in fact, encompasses everything that you're interested in, in any event. In our view, the judge only ruled on the element of Sienter in the motion for reconsideration order. So the Sienter allegations would be at issue there. However, we do believe that the defendants have waived their ability to argue that the timing rules prevent consideration of the three prior orders. Under this Court's determination in Weitzner v. Sinoshare and Legg v. Ulster, these timing rules in federal rule of appellate procedure 4 and federal rule of civil procedure 6 were determined to be claims processing rules that are subject to forfeiture, waiver, and equitable exceptions. Plaintiffs have cited several cases determined by this Court that the failure to raise enforcement of these rules at the District Court level when the extension is sought is a waiver to later, it's too late to now argue at the appellate level, and defendants here raised it for the first time in their appellate brief. There was no mention of it at the District Court level. It's now been waived. We also believe this is subject to the equitable exception of extraordinary circumstances. Judge Kaplan's motion to dismiss order was issued on March 26, 2020. I don't think I have to go into much detail about the upheaval that the COVID-19 pandemic caused, but plaintiffs filed a motion for reconsideration brief as well as a very long detailed amended complaint that took quite a long time to put together. So we believe a short 14-day extension was reasonable in light of the pandemic. Well, in any event, what I hear you saying, then, is you think that all of the pretrial orders and the new evidence orders and the standard findings, everything is kind of fair game on this appeal. Is that right? Correct. Okay. Thank you. Okay. So back to the statements that were made after the Dear Health Care Provider letter was issued. In September 2017, Intercept issued a Dear Health Care Provider letter warning that patients, PBC patients taking Alcolava had experienced liver injury, death, and some patients had been overdosed. This was negative news to the market. The stock dropped about 20% in reaction to this announcement. And plaintiffs allege in order to mitigate any further damage to the stock price, the defendants went out and made a series of misleading statements that were intended to create the misimpression that these issues were limited to a smaller subset of patients. Defendants made statements that these issues only pertain to late-stage patients who had been overdosed, that there were only approximately 10 adverse events observed, and that causation could not be established. What defendants failed to disclose is that there were five early-stage patients who had been, excuse me, who had experienced serious liver injury and had not been misdosed. There were far more than 10. This is five in the denominator of how many? Are we at the 3,000 stage or the 1,200 stage? When you look at the, at this point, there were 3,000 PBC patients who had taken Alcolava. However, that encompasses early-stage patients and late-stage patients. Yes, but you're still talking about five. I mean, part of what the judge, the district judge was emphasizing was how small a number this was and how sick the patient population participating in the Phase III and Phase IV trials was. And so I have difficulty understanding the materiality of the argument and also the notion that the failure to disclose with specificity those five serious adverse events reflects any kind of scienter on the part of the defendants. What am I missing? We believe that the FDA takes cases of liver injury very seriously. Historically, fewer cases of liver injury have been of concern to the FDA, have resulted in FDA action. Here, if you look at the reaction of the market, they were very concerned with these five cases. Analysts expressed surprise and concern after these cases were disclosed. A case of one death in July 2017 was of concern to the market. But Alcolava is still being marketed. It's still being used, right? And this was an alternative, the only alternative available to people who were unable to tolerate the earlier treatment. Correct. It is still being used. However, the FDA put a black box warning on the drug label. And plaintiffs allege in the proposed amended complaint that that reduces the number of prescribers who will prescribe the drug. I think it's something along the lines of 50% of prescribers will be hesitant to then prescribe the drug. So we believe that these cases do have a serious impact on the marketability of Alcolava based on the FDA's decision to put a black box warning. And what makes the inference of Cyanter compelling? What detailed allegations do you have as to defendant's knowledge that they were withholding something that was important to the market and that they were doing so for deceptive purposes? In regard to this third subset of statements, the district court determined that defendants had knowledge of these adverse events. You're talking about after the letter, right? Correct. After the adverse effects letter. Correct. Before that, you're simply saying, well, they were senior people in the business and they must have known. We also point to statements made by the individual defendants indicating that they were familiar with the underlying safety data and the underlying dosing data. They made statements about the side effects being experienced by patients, the tolerability profile of the drug. In order to make those statements, they certainly had to review some underlying data. I can't think of anything... Was any causation ever established? I mean, this was a very, very seriously ill patient body. And, you know, the notion that the drug was associated with means they were taking it at the same time. But it wasn't clear to me from what you've alleged that the people running the company would have needed to conclude or, you know, that that was the most reasonable conclusion, that the injuries were caused by Calava. What did I miss in your allegations? Well, we don't believe we need to show causation at this point. Causation also could not be ruled out under... No, but for them to be hiding something that is bad for being deceptive about the drug, there was nothing to hide at that point. Well, if you look at the FDA's reaction to two deaths in the trials and the FDA's reaction to the serious liver injury that was observed in the trials prior to approval, the FDA was very concerned over these two deaths and it was very concerned over any indication of liver injury. That's why it approved a lower dose for the late-stage patients. So we believe the allegations do support that these 19 deaths and 11 cases of liver injury were very serious. As we pointed out, the FDA historically has taken liver injury to be very seriously. Regardless of how sick the patients are, obviously we have some early-stage patients who are much healthier who are also experiencing liver injury. All right. Thank you very much. You've reserved three minutes for rebuttal. Mr. Boretsky. Good morning, Your Honors. May it please the Court. I'm Shai Boretsky with Skadden on behalf of the apologies. If I could, I'd like to start out setting the stage a little bit about the nature of these serious adverse event reports because I think that's important for understanding why this is the sort of case that Congress in the PSLRA and the Supreme Court in the Matrix decision indicated ought to be decided as a matter of law at the outset. As the Supreme Court explained in Matrix, and this is a quote from the opinion of page 44, the mere existence of reports of adverse events says nothing in and of itself about whether the drug is causing the adverse effects. And that's particularly true when you think about the SAEs that the plaintiffs are focusing on here. They're focusing on adverse events that largely occurred in patients with a very serious late-stage liver disease that have high comorbidity and high mortality rates, making it almost impossible to determine from the limited information in the SAE reports whether there was causation. Moreover, the plaintiffs are focused on a very small number of SAE reports. Since you mentioned Matrix, I mean, the Court goes on to say causation isn't essential and even statistical significance isn't essential. It goes on to say it's sort of anything that might matter to the market, to the basic mix of information. And in that case, there were 10 patients who lost their sense of smell. Here you have 19 deaths. How does this compare with Matrix to help you? I think there were a lot of factors going into the Matrix decision that are absent here. In the Matrix decision, there were multiple reports from medical professionals and experts about causation. Those were presented at public conferences. The company had been sued in four different lawsuits alleging causation. The company itself had hired a consultant to study causation. And in the face of all of that, the company issued a press release that said that studies had expressly ruled out causation when that wasn't true. What about what your adversary says, that in the end, it caused the FDA to require a black box warning associated with the distribution of the medication? Doesn't that suggest that the FDA has a view that there is some causation? No. That these were significant events? No, Your Honor. The FDA has never found causation. The FDA has not restricted the marketability of the drug in any way. What does the requirement of the black box signal, if not some concern about association at least? Well, it just underscores the need to adhere to proper dosing. But it does not in any way limit the marketability of the drug, which, Judge Cardi, as you pointed out, continues to be on the market. If the FDA actually had concerns about causation, if it had made that finding, you would expect to see the FDA take stronger action than simply underscoring the warnings and the dosage information that was on the drug to begin with. And so the nature of these serious adverse event reports simply does not establish causation. And so turning to the two particular issues that plaintiffs focused on this morning, one is the jurisdictional issue and the other is the statements following the Dear Healthcare Provider letter. With respect to the jurisdictional issue, as we explained in our brief, Rule 4 is very clear. Notice of appeal has to be filed within 30 days. That is told for Rule 15. Even if we agree with you on that, though, it seems to me that the judge's ruling on the motion to reconsider was fairly broad. He also addressed the ruling about getting documents from the European Medical Group, what have you. And so it seemed to really encompass much of what had been addressed in his earlier orders. Are we precluded from considering any of that? I mean, what restricts us, even if we agree with you about our jurisdictional limits? So if I could break that down, because I don't think that's entirely correct as to the three prejudgment orders that they're challenging. Okay. One prejudgment order that they're challenging is the denial of leave to amend. While the initial denial of leave to amend was proper, that ruling is in any event moot at this point because the district court did consider the proposed amended complaint and found it futile. So in that sense, I think their argument about the motion for leave to amend is simply moot at this point. With respect to the PSLRA discovery stay, what the district court did in its second opinion was to underscore that nothing about Intercept's conduct in connection with the European proceeding supports a strong inference of scienta. I think you'd have to ask my opposing counsel, but I think what they're actually asking this court to do is to reverse the district court for denying their relief from the stay of discovery. And that, I think, is barred by their failure to file a timely notice of appeal as to that issue. All right. That's very helpful. Thank you. And with respect to the Dear Healthcare Provider letter, the letter itself that the company issued disclosed information about both early and late-stage patients, both the late-stage patients and the five other cases that the plaintiff's saying needed to be mentioned later. The problem with their argument is that once the company disclosed that information once, it's not obligated to repeat all of the information that was in the Dear Healthcare Provider letter every time it speaks about this general subject matter. The securities laws simply don't require that. The company focused on ten particular late-stage patients who died, but that doesn't mean that it needed to talk about every other incident that had already been reported and made publicly available in the Dear Healthcare Provider letter. But doesn't the hit that the stock took when that Dear Healthcare Provider letter came out suggest the importance to investors and the materiality of the knowledge, assuming that they had the knowledge six, nine months earlier? In other words, about the number of significant adverse events or serious adverse events.  However, we can't read into that which particular incidents disclosed in the letter the market was in some way potentially reacting to. And moreover, if I understand Your Honor's question correctly, if you're asking whether these events needed to be reported any earlier, that brings me back to my point that the serious adverse events themselves, the reports, don't establish any sort of causation. And the mere fact of a serious adverse event report with nothing further is not something that needs to be separately disclosed, especially when these were publicly available reports disclosed to the FDA. Am I right in understanding that the serious adverse event, I'm sorry to interrupt your flow here, but the serious adverse, the manufacturer has to file an SAE whenever a person participating in a trial experiences something, including a death for no matter what reason. That is, if they're, I don't know, if they're injured in a car accident, whether that still has to be responded to and reported. Is that correct? Correct. If you look at the serious adverse event reports that were filed in connection with tests for the vaccine for 5 to 12-year-olds, there's one from a child who swallowed a penny. I don't think anybody thinks that had anything to do with the vaccine. And so the serious adverse event reports themselves do not establish causation. What the plaintiffs need to establish here is also a strong inference of scienter. And you can't establish that just from the existence of serious adverse event reports. Merely potential access to those reports is not sufficient to establish scienter. They make no particularized allegation that any individual defendant even reviewed these serious adverse event reports. And if they had, because of the nature of the serious adverse event reports, that still wouldn't establish causation requiring disclosure. The plaintiffs in their brief focus on two categories of statements. One, some specific statements that the defendants made about itchy skin as a side effect of the drug. But there's no particularized allegation that those reports also discussed the SAEs. No, but it does suggest still that if they were aware of itchiness as a potential side effect for the drug, that they might also be aware of deaths that had occurred. Because it's their business to monitor what's going on as the trial is getting conducted, isn't it? Well, the most I would say is that it doesn't rule out that they would be aware of something else. But the standard for proving scienter is much higher. What the plaintiffs are trying to do here is to establish that because the defendant spoke about itchy skin, therefore they must have been trying to mislead investors about the serious adverse event reports. And that simply doesn't follow. There's no particularized allegation in the complaint that the itchy skin reports also accompanied the SAE reports. Could I just ask, you mentioned the FDA reports that are public, and there's some back and forth about whether they're public. Could you shed any light on to what extent they're public? I think the plaintiff's reply brief suggests that it wasn't until some later date where they were actually accessible as a practical matter. Can you shed any light on that? Two points on that. One, whatever their degree of accessibility to the person on the street, the company wasn't trying to hide this from the government. In fact, it was complying with its obligations to submit the reports to the FDA. Second, I think there is some question about how easily these were accessible at any particular point. But throughout the class period for efficacy, you could always file a FOIA report, a FOIA request, and get these reports. And nobody is hiding this. It's just a question of the mechanism from which you get them. Fine. Thank you very much. Thank you. We'll reserve decision. Ms. Remmel, you have three minutes of rebuttal. Thank you. I will first begin by addressing the public nature of the SAE reports. At the time of the class period, the portal looked differently than it does now. Now they're publicly available on portal. At the time of the class period, these adverse event reports were only available quarterly, and they were available in kind of a strange data format that had the FDA admitted that you needed fairly complex analytical tools to analyze. Under Ganino versus citizens' utility, this is not sufficient for a truth on the market defense. These are not sufficiently publicly available. That kind of segues into the other argument regarding the one line in the dear health care provider letter about the early stage patients. This defense essentially make a truth on the market defense, which under Ganino is not usually appropriate at the motion to dismiss stage because it's a very fact-intensive inquiry. That being said, any disclosure that's made must be made with the same intensity and credibility to counterbalance the subsequent misleading statements. If you look at the reaction of analysts after the class period, we don't believe that this one line was sufficient to put the market on notice of these five early stage patients in light of the defendant's subsequent misleading statements, leaving the impression that this was an issue limited to a small subset of late stage patients. And I'd also like to discuss the serious adverse event reports. In regard to the dear health care provider letter, at that point the FDA had become involved. The FDA became involved with Intercept in this issue after the death was reported in July 2017. So Intercept knew at that point when they were making statements about the serious adverse events after the dear health care provider letter was issued that this was a concern to the FDA. This being the dosing level, which was so much reduced for late stage PBC patients, right? The dosing level as well as the liver injury and the deaths observed that were reported in the dear health care provider letter and then reported in the FDA safety warnings that were issued nine days after. The FDA had become involved when the dear health care provider letter was issued. So Intercept was aware that this was a concern to the FDA. And finally, in regard to whether we can show causation, under Matrix, in order for the adverse event reports to be material, we just need to show the source content and context of the reports supports materiality. Here we have shown that this has been a historical concern to the FDA. And if you look at the factors that are considered in Matrix, such as a dose-dependent relationship, temporal proximity of the event to prescribing the drug, we believe that we have sufficiently provided that. All right. Thank you very much. Thank you both. We'll reserve decisions. That concludes our calendar for this morning for oral argument. The clerk will please adjourn court. Court is adjourned. Court is adjourned.